UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

HASSON MITCHELL                                        CIVIL ACTION

VERSUS

STATE OF LOUISIANA, ET AL.                          NO. 20-00470-BAJ-SDJ

## RULING AND ORDER

Plaintiff is an inmate at the Elayn Hunt Correctional Center ("EHCC") in St. Gabriel, Louisiana. He alleges that on December 21, 2017 he protested a correctional officer's mistreatment of a fellow inmate, prompting the same officer to handcuff him, mace him, and forcibly "throw" him into the shower, causing him to trip over a concrete partition, fall, and suffer multiple broken bones.

Plaintiff seeks damages from the offending officer—Defendant Lt. Allen Stark—alleging constitutional claims of excessive force and retaliation, and state law claims of negligence and battery. Plaintiff also seeks recovery from Lt. Stark's employer—Defendant Louisiana Department of Public Safety and Corrections ("LDPSC")—asserting that LDPSC is vicariously liable for Lt. Stark's state law torts.

Now before the Court is Defendants' **Motion For Summary Judgment (Doc. 41)**. Plaintiff opposes Defendants' Motion. (Doc. 43). For the reasons stated herein, Defendants' Motion will be denied and Plaintiff's claims will be submitted to a jury.

## I. BACKGROUND

### A. Summary Judgment Evidence

The facts set forth below are drawn from Defendants' Statement Of Uncontested Facts (Doc. 1-2; Doc. 41-8, "SOF"), Plaintiff's Response To Statement Of

Facts (Doc. 43-12, "Response SOF"), the parties' joint Pre-Trial Order (Doc. 50, "PTO"), and the record evidence submitted in support of these pleadings.[1]

On December 21, 2017, Lt. Stark and three additional correctional officers—non-parties Col. Brent Thompson, Capt. Donald Johnson, and Lt. Eric Lane—responded to reports of "an offender breaking glass" in EHCC's "Fox 7" yard. (Doc. 41-2 at ¶ 2; Doc. 41-3 at ¶¶ 2-4). Upon arriving at Fox 7, Lt. Stark approached inmate Thomas Miller—the offender allegedly responsible for the broken glass—"to remove him from Fox 7." (Doc. 41-2 at ¶ 4).

Plaintiff and multiple other inmates were also in the Fox 7 yard at the time.

---

[1] Plaintiff encourages the Court to treat the allegations set forth in his original *un-verified* complaint as summary judgment evidence, based on a subsequent letter to counsel in which he states, "I declare under the penalty of perjury that the facts stated are true and correct in my ARP and in my lawsuit." (Doc. 43-1). "A plaintiff's verified complaint can be considered as summary judgment evidence to the extent that it comports with the requirements of Fed. R. Civ. P. 56." *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994).

Here, there are two problems with Plaintiff's purported verification. First, it comes three years after Plaintiff's complaint, and Plaintiff cites no authority that allows the Court to effectively convert an unverified complaint to competent summary judgment evidence based on an after-the-fact verification. Second, Plaintiff's purported verification is deficient because it does not state that it is made on personal knowledge, and does not specify what Plaintiff means by "my lawsuit." Further, Plaintiff's "ARP" is not part of the summary judgment record. Thus, Plaintiff's verification fails the specificity requirements set forth at Rule 56(c). *See Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 161 (5th Cir. 2021) ("Self-serving affidavits and declarations, like all summary judgment evidence, must "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). And these facts must be particularized, not vague or conclusory.").

The Court will not excuse these deficiencies when, as here, Plaintiff is represented by counsel. Accordingly, for now, the Court disregards the allegations set forth in Plaintiff's complaint *and* his "ARP." In any event, Plaintiff is not prejudiced by this ruling, because sufficient additional evidence exists to create a material dispute defeating summary judgment.

Inmate Dwayne Miller—Thomas Miller's cousin—witnessed Lt. Stark's encounter with Inmate Miller, and saw Lt. Stark "punching[,] kicking and stomping" him. (Doc. 43-6 at p. 1; *see also* Doc. 43-8 at p. 1)). Eventually, Lt. Stark placed Inmate Miller in handcuffs, and escorted him out of the yard. (Doc. 41-2 at ¶ 4).

Plaintiff also witnessed Lt. Stark's encounter with Inmate Miller, and attempted to intervene. Fellow inmate Cleveland Bell recalls that Plaintiff was calm, telling Lt. Stark "that he didn't have to treat him [Inmate Miller] like that," and thereafter telling Capt. Johnson (in Lt. Stark's presence) "that he had no problem, and … was just trying to get Lt. Stark to stop using excessive force, because [Lt. Stark] was clearly doing too much." (Doc. 43-8 at p. 1). By contrast, Capt. Johnson remembers Plaintiff "being unruly," "yelling," and encouraging other offenders to "jump on" Lt. Stark, saying "Man we are going to beat Lt. Stark's a**," and "Man y'all some b******. Let's get this mother f*****." (Doc. 41-2 at ¶¶ 4-6).

Perceiving a threat, Capt. Johnson "immediately ordered [Plaintiff] to place his hand [sic] behind his back to be handcuffed." (Doc. 41-2 at ¶ 4). Plaintiff "complied." (*Id.* at ¶ 7). Then, Capt. Johnson ordered Lt. Lane "to escort [Plaintiff] to Administrative Segregation, also known as Beaver 5." (*Id.* at ¶ 8).

Lt. Lane followed Capt. Johnson's command, and recalls that Plaintiff "was acting unruly" "[d]uring the entire transport from Fox 7 to Beaver 5." (Doc. 41-3 at ¶ 5). Significantly, however, Lt. Lane provides no description of Plaintiff's "unruly" behavior, or any indication that Plaintiff's behavior caused a disturbance, impeded

3

Lt. Lane's ability to escort Plaintiff to Beaver 5, or necessitated a forceful response. (*See id.* at ¶¶ 3-5).

Lt. Stark met Lt. Lane and Plaintiff in Beaver 5's main lobby. (*Id.* at ¶¶ 6-7). Lt. Stark took control of Plaintiff—who remained handcuffed—at which point Lt. Lane immediately "exited." (*Id.* at ¶¶ 6-7). After Lt. Lane left, Lt. Stark led Plaintiff to the Beaver 5 segregation unit, where they were observed by two additional correctional officers—Master Sergeants Kendrick Williams and Carmen Dowdy—and two additional inmates—Shane Chesne and Travis Dunn.

Sgt. Williams was "in the Beaver 5 interlock" when he observed Lt. Stark "[come] in the door with [Plaintiff]." (Doc. 41-4 at ¶ 2). Sgt. Williams recalls that Plaintiff "was in handcuffs," and "was being combative"—*i.e.*, "physically resisting" and "refusing all orders that [Lt. Stark] was giving him." (*Id.* at ¶¶ 4-5). Sgt. Williams also remembers that he "heard Plaintiff tell [Lt. Stark], 'I'm going to get you.'" (*Id.* at ¶ 6). Then, Sgt. Williams "reached down to grab a set of full restraints when [he] heard a loud noise." (Doc. 41-4 at ¶ 3). Apparently, Lt. Stark had "take[n] [Plaintiff] to the ground ... to get him under control so that Plaintiff would not harm himself, other offenders or security staff." (*Id.* at ¶ 7). Notably, Sgt. Williams does *not* state that he witnessed Lt. Stark take Plaintiff "to the ground." (*See id.*).

Sgt. Williams further states that after Lt. Stark took Plaintiff to the ground, he (Sgt. Williams) "exited Beaver 5 Interlock and opened C-Tier to allow access to the shower," at which point Lt. Stark "escorted [Plaintiff] into the shower." (Doc. 41-4 at

4

¶¶ 8-9). After Lt. Stark "escorted" Plaintiff into the shower, Sgt. Williams recalls removing Plaintiff's handcuffs and ordering Plaintiff to submit to a strip search. (*Id.* at ¶¶ 10-11). Plaintiff initially refused, "but he eventually complied," submitting to a search conducted by Lt. Stark. (*Id.* ¶ 11).

Sgt. Dowdy corroborates Sgt. Williams' account, to a point. Sgt. Dowdy was also in the "Beaver 5 Interlock when [she] observed [Lt. Stark] enter … with Plaintiff," who "was acting irate and using profanity." (Doc. 41-5 at ¶¶ 2-3). Sgt. Dowdy heard Plaintiff "state in a loud, boisterous tone, 'I'm not going in the shower'" —even after Lt. Stark "ordered him several times to do so"—and saw Plaintiff "turn his body away from [Lt. Stark] while [Lt. Stark] was attempting to escort him into the shower." (*Id.* at ¶¶ 4-5). Even so, Sgt. Dowdy "did not witness when [Lt. Stark] took [Plaintiff] to the ground." (*Id.* at ¶ 6).

Inmates Chesne and Dunn offer accounts that are generally consistent with the statements of Sgts. Williams and Dowdy. Each, however, provides additional detail that frames Lt. Stark's actions in a substantially different light. Inmate Chesne states:

> I saw [Lt. Stark] bring [Plaintiff] in the lobby of Beaver #5 handcuffed[,] at which time [Plaintiff] started screaming that they was [sic] hurting him. After a few minutes … Lt. Stark threw [Plaintiff] in the shower[,] sprayed him with mace and told him to shut the f*** up before they kick his a** some more. [Plaintiff] laid on the floor crying for medical help … at which time he started using the bathroom on his self [sic].

(Doc. 43-7 at p. 1).

Inmate Dunn offers a similar account, with additional detail:

> I ... was housed in Beaver 5 ... when I saw Lt. Stark dragging and
> punching [Plaintiff] up the walk into Beaver 5 unit ... . They then threw
> [Plaintiff] in the shower half way while he was handcuffed behind his
> back. He [Plaintiff] had no way to brace his fall. He [Plaintiff] landed on
> the 1 foot tall, 1 foot wide concrete partition that you have to step over
> to enter the shower. I heard him scream in pain and complain about his
> back and arm that he landed on, telling Lt. Stark after he threw him
> that he think [sic] he broke something. They told him nothing is wrong
> with him and drug him the rest of the way into the shower. Lt. Stark
> continued to assault [Plaintiff] in the shower with restraints. I heard the
> audible noises of the assault as well as [Plaintiff] begging them to stop.
> Lt. Stark deployed chemical agents onto him while he was laying down
> restraining in the shower.

(Doc. 43-9 at p. 1).

The next day (December 22) Plaintiff sought medical attention from EHCC

medical staff. Plaintiff's certified medical records show that he complained of "an

altercation" with a "C/O" that resulted in "[left] wrist pain," "facial and lower back

pain," incontinence, and other "symptoms." (Doc. 43-11 at p. 70). EHCC medical staff

braced Plaintiff with a C-collar, and arranged for ambulance transport to the

emergency room at Our Lady of the Lake Regional Medical Center (OLOL), where

Plaintiff was admitted and diagnosed with a broken wrist. (*Id.* at pp. 66, 70). OLOL

staff also observed an "age-indeterminate fracture of [Plaintiff's] left L2" vertebrae.

(*Id.* at p. 67; *see also* Doc. 43-4 at pp. 1-2).

OLOL records reflect that Plaintiff's initial "complaint" to OLOL emergency

staff was consistent with Plaintiff's complaint to EHCC medical staff:

> Mr. Mitchell [Plaintiff] is a 38 yo man with no significant PMH who was
> brought in from prison after being assaulted yesterday around 3pm.
> Patient reports his head was slammed against a wall and he was thrown
> on the ground and kicked. Endorses LOC for unknown amount of time.

6

Complains of generalized headache associated with blurry vision and
worsened with photophobia. Complains of left facial pain, neck pain, rib
pain, lower back pain, and left wrist pain. States he tried to walk this
morning but had too much pain. Pain improved with rest.

(Doc. 43-4 at p. 2).

Plaintiff's medical records reflect that he complained of ongoing pain for
months after his December 21 encounter with Lt. Stark. (*See generally* Doc. 43-11).
Another inmate—Cleveland Bell—states that after the December 21 altercation,
Plaintiff "looked like he'd been in some bad accident. His face was badly swollen on
one side, and he had to use a wheelchair for awhile [sic]." (Doc. 43-8 at p. 1).

Notably absent from the summary judgment record is any account from Lt.
Stark regarding the events of December 21, 2017.

### B. Procedural History

Plaintiff initiated this action in the Eighteenth Judicial District Court for the
Parish of Iberville, Louisiana, naming Lt. Stark and LDPSC as Defendants. (Doc. 1-
2). Against Lt. Stark, Plaintiff alleges claims of unlawful retaliation in violation of
the First Amendment and excessive force in violation of the Eighth Amendment, and
state law claims of negligence and battery. (Doc. 1-2 at ¶¶ 49-51, 53-60). Against
LDPSC, Plaintiff alleges *respondeat superior* liability for Lt. Stark's state law torts.

LDPSC removed Plaintiff's action to this Court, asserting federal question
jurisdiction. (Doc. 1). Now Defendants jointly move for summary judgment, arguing
(1) Plaintiff's constitutional claims fail because Lt. Stark is shielded by qualified
immunity (Doc. 41-1 at pp. 6-18); Plaintiff's negligence and battery claims fail because

7

Lt. Stark followed EHCC policy and employed appropriate force "to obtain control of the situation," (*id.* at pp. 18-21); and (3) in turn, Plaintiff's *respondeat superior* claim fails because Plaintiff cannot "prove that Lt. Stark is liable for any negligence," (*id.* at p. 20). Plaintiff opposes Defendants' Motion. (Doc. 43).

## II. ANALYSIS

### A. Standard

The summary judgment standard is well-set: to prevail, the moving party must show that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In making this assessment, the Court must view all evidence and make all reasonable inferences in the light most favorable to the non-moving party. *Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 824 (5th Cir. 2022).

Importantly, at summary judgment, it is *not* the Court's "function ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). It follows that "[c]redibility determinations have no place in summary judgment proceedings." *Richardson v. Oldham*, 12 F.3d 1373, 1379 (5th Cir. 1994).

Equally important, whether moving for *or* against summary judgment, a party's evidence "must be particularized, not vague or conclusory." *See Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 161 (5th Cir. 2021). "[S]peculation, improbable inferences, or unsubstantiated assertions" will not carry the day. *Jones v. United*

*States,* 936 F.3d 318, 321 (5th Cir. 2019) (quotation marks omitted).

### B. Discussion

#### 1. Lt. Stark is not entitled to qualified immunity from Plaintiff's constitutional claims

"The doctrine of qualified immunity shields a government official performing discretionary functions from civil damages liability, provided his complained of actions meet the test of 'objective legal reasonableness.'" *Staten v. Tatom,* 465 F. App'x 353, 357 (5th Cir. 2012) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 819 (1982)). "We assess the 'objective reasonableness' of an officer's actions in light of the particular circumstances and the legal rules 'clearly established' at the time the officer's actions were taken." *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 639 (1987)).

In practice, the two-pronged test for qualified immunity asks (1) "whether the facts, viewed in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right," and (2) "whether the right was 'clearly established.'" *Cunningham v. Castloo,* 983 F.3d 185, 190-91 (5th Cir. 2020). A court may analyze these prongs in either order, and resolve the case on a single prong. *Id.* at 190.

Critically, "[a] qualified immunity defense alters the usual summary judgment burden of proof," because "[o]nce a government official asserts [qualified immunity], the burden shifts to the plaintiff to rebut the defense." *Bourne v. Gunnels,* 921 F.3d 484, 490 (5th Cir. 2019) (quotation marks omitted); *see also Collier v. Montgomery,*

569 F.3d 214, 217 (5th Cir. 2009) ("Although nominally an affirmative defense, the plaintiff has the burden to negate the assertion of qualified immunity once properly raised."). Still, however, "all inferences are drawn in the plaintiff's favor." *Bourne*, 921 F.3d at 490 (quotation marks and alterations omitted).

### a. Excessive Force

Plaintiff contends that Lt. Stark used excessive force when he threw him—handcuffed and not resisting—into the shower, then maced him and continued to assault him.

It is clearly established that the Eighth Amendment protects prisoners from "the unnecessary and wanton infliction of pain" at the hand of prison officials. *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (quotation marks omitted). When, as here, a prison official invokes qualified immunity to defend against a prisoner's claim of excessive force, "the core judicial inquiry is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Bourne*, 921 F.3d at 491 (quoting *Hudson*, 503 U.S. at 6–7).

> Courts analyze (1) the extent of the injury suffered, (2) the need for the application of force, (3) the relationship between that need and the amount of force used, (4) the threat reasonably perceived by the responsible officials, and (5) any efforts made to temper the severity of a forceful response.

> The amount of force that is constitutionally permissible must be judged by the context in which that force is deployed. Courts must decide excessive force claims based on the nature of the force rather than the extent of the injury. An inmate need not establish a significant injury to pursue an excessive force claim because injury and force are only imperfectly correlated, and it is the latter that ultimately counts.

*Bourne*, 921 F.3d at 491-92 (alteration, quotation marks, and citations omitted).

Viewed in the light most favorable to Plaintiff, and drawing all reasonable inferences in Plaintiff's favor, the sum of the summary judgment evidence establishes the following: On December 21 Plaintiff observed Lt. Stark forcibly remove Inmate Miller from the Fox 7 yard. Plaintiff attempted to intervene, creating the potential for a broader disturbance among the other inmates in the Fox 7 yard, but nonetheless promptly complied when Capt. Johnson ordered him to place his hands behind his back to be handcuffed. Thereafter, Lt. Lane removed Plaintiff (handcuffed) from the Fox 7 yard to the Beaver 5 lobby without any appreciable difficulty.

Once in Beaver 5, Lt. Stark took over. Plaintiff verbally and physically resisted Lt. Stark, and, according to Capt. Johnson, Lt. Stark took Plaintiff to the ground to gain control over the situation (though Capt. Johnson did not see this first takedown). After this initial takedown, Plaintiff submitted to Lt. Stark's control and allowed Lt. Stark to "escort" him to the shower without further resistance. Nonetheless, despite Plaintiff's compliance, Lt. Stark threw Plaintiff (still handcuffed) into the shower area, causing Plaintiff to trip over the concrete partition, fall, and break his left wrist (and possibly his back). As Plaintiff was crying out in pain, Lt. Stark sprayed him with mace, continued to beat him, and "told him to shut the f*** up before they kick his a** some more."

The Court assumes for present purposes that Lt. Stark's initial takedown was a constitutionally permissible "good-faith effort to maintain or restore discipline." *See*

11

*Bourne*, 921 F.3d at 491 (quoting *Hudson*, 503 U.S. at 6–7). Lt. Stark's subsequent acts are another matter. First, of course, Plaintiff suffered substantial injuries—a broken wrist and possibly a broken back. Second, Lt. Stark had *already* gained Plaintiff's compliance when he threw Plaintiff into the shower, maced him, and beat him, eliminating the need for additional force. This inference naturally follows from Capt. Johnson's account, which conspicuously omits *any* indication that Plaintiff resisted as Lt. Stark "escorted [him] into the shower." Third, without any need, Lt. Stark nonetheless applied substantial force, "throwing" Plaintiff hard enough that he stumbled and tripped over a known and obvious hazard (the concrete partition), and thereafter beating Plaintiff. Fourth, there is no evidence that when Lt. Stark reasonably perceived an ongoing threat when brought Plaintiff to the shower. In fact, the available evidence reasonably suggests the opposite—that Plaintiff was *not* a threat: Plaintiff had been removed from the Fox 7 yard (where he might have created a disturbance among the other inmates), and had submitted to Lt. Stark's control. Fifth, there is also no evidence that *after* the initial takedown and *before* throwing Plaintiff into the shower, Lt. Stark attempted to temper the severity of his actions. Indeed, it appears that Lt. Stark escalated his response even after throwing Plaintiff into the shower, by deploying mace and beating Plaintiff when he on the ground, crying out in pain.

On this record, and absent any account from Lt. Stark, Plaintiff has plainly produced enough evidence to rebut Lt. Stark's qualified immunity defense and

establish a genuine contest regarding whether Lt. Stark acted "maliciously and sadistically to cause harm" when he threw Plaintiff—handcuffed and no longer resisting—into the shower, and thereafter assaulted him. *See Bourne*, 921 F.3d at 491 (quoting *Hudson*, 503 U.S. at 6–7); *e.g. id.* 921 F.3d at 492–93 (contested issues of fact defeated defendants qualified immunity defense to excessive force claim where the parties offered "competing versions of what occurred during the use of force and whether defendants applied force after [plaintiff] stopped resisting and was restrained [with handcuffs]"); *Rankin v. Klevenhagen*, 5 F.3d 103, 105 (5th Cir. 1993) (summary judgment evidence sufficiently established excessive force where prison guard "placed [plaintiff] in a 'compliance hold,' slammed him against a wall and the jail's floor, handcuffed him and 'stomped' on his back and legs"); *Cf. Cowart v. Erwin*, 837 F.3d 444, 454 (5th Cir. 2016) (rejecting defendant's qualified immunity defense and affirming jury's excessive force verdict where defendant punched plaintiff twice in the face after plaintiff was "restrained and non-threatening"; "We have little difficulty concluding that in 2009, the time of the incident, it was well-established, in sufficiently similar situations, that officers may not 'use gratuitous force against a prisoner who has already been subdued ... [or] incapacitated.'").[2]

---

[2] *See also Perez v. Collier*, No. 20-20036, 2021 WL 4095263, at *4 (5th Cir. Sept. 8, 2021) ("Under Perez's version of the facts, he was handcuffed and complying with the officials' orders to return to his cell when they punched him, gouged his eye, and twisted his fingers. All reasonable officials in these circumstances would have known that this conduct violated Perez's Eight Amendment rights."); *Chacon v. York*, 434 F. App'x 330, 332 (5th Cir. 2011) ("By declaration made under penalty of perjury, Chacon asserted that Deputy York used unnecessary force against him without provocation and that he suffered a laceration above his right eyelid requiring at least one stitch and a staple. ... Because it is not possible to

In sum, on December 21, 2017, Plaintiff maintained a clearly established right to be free from "the unnecessary and wanton infliction of pain" at the hands of Lt. Stark. *Hudson,* 503 U.S. at 5. An officer confronted with the same circumstances presented here would have known that it was unlawful to forcibly throw a restrained *compliant* prisoner towards a known hazard and thereafter mace him and beat him when he was in a prone position. Yet, here an evidentiary basis exists to conclude that this is exactly what happened. Accordingly, Lt. Stark's qualified immunity defense fails, and Plaintiff's excessive force claim must be submitted to the jury.

### b. Retaliation

Plaintiff's retaliation claim is interwoven with his excessive force claim. Specifically, Plaintiff contends that Lt. Stark threw him into the shower to "punish" him for having "complained to ranking officers about … [Lt. Stark] beating … Inmate Miller." (Doc. 43 at pp. 12, 17).

"The law of this circuit is clearly established … that a prison official may not retaliate against … an inmate for … complaining to a supervisor about a guard's misconduct." *Woods v. Smith,* 60 F.3d 1161, 1164 (5th Cir. 1995).

"To state a valid claim for retaliation under section 1983, a prisoner must allege (1) a specific constitutional right, (2) the defendant's intent to retaliate against

---

conclude as a matter of law, considering the evidence in the light most favorable to Chacon, that York acted in an objectively reasonable manner-which would entitle him to qualified immunity-the district court erred in granting the motion for summary judgment for York on the excessive force claim.").

14

the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation." *Jones v. Greninger*, 188 F.3d 322, 324–25 (5th Cir. 1999).

Again, viewing all evidence and making all reasonable inferences in Plaintiff's favor, Plaintiff overcomes qualified immunity. First, as stated, the Constitution protects an inmate's right to "complain[] to a supervisor about a guard's misconduct." *Woods*, 60 F.3d at 1164. Here, Plaintiff's December 21 encounter with Lt. Stark began when Plaintiff objected to Lt. Stark's treatment of Inmate Miller. According to Inmate Bell, Plaintiff's objection was calm and included complaining to Capt. Johnson—a higher ranking officer—*in* Lt. Stark's presence that "Lt. Stark [was] using excessive force." Capt. Johnson, on the other hand, states that Plaintiff was "unruly" and "attempt[ing] to motivate a disturbance." Plainly, a material dispute exists regarding whether Plaintiff was engaged in a constitutionally protected complaint, or an unprotected attempt to provoke an insurrection. *Cf. Jackson v. Cain*, 864 F.2d 1235, 1248 (5th Cir. 1989) ("A prison inmate is entitled to his First Amendment right to freedom of expression so long as it is not inconsistent with his status as a prisoner and does not adversely affect a legitimate state interest.").

Second, the evidence establishes a genuine dispute regarding whether Lt. Stark was motivated by retaliatory intent. Again, Inmate Bell states that Plaintiff made his complaint to Capt. Johnson in Lt. Stark's presence. Sgt. Williams states that minutes later Lt. Stark took Plaintiff to the ground then escorted him (without incident) to the shower. Inmates Chesne and Dunn, by contrast, state that Lt. Stark

threw Plaintiff into the shower when Plaintiff was compliant and no longer resisting, sprayed him with mace, beat him, and "told him [to] shut the f*** up before they kick his a** some more." (Doc. 43-7 at p. 1; *see also* Doc. 43-9 at p. 1). It is not the Court's role here to decide between these conflicting accounts.

Third, a dispute exists regarding whether Lt. Stark took a retaliatory adverse act against Plaintiff. An actionable retaliatory act is any act "capable of deterring a person of ordinary firmness from further exercising his constitutional rights." *Morris v. Powell*, 449 F.3d 682, 686 (5th Cir. 2006). Such acts specifically include acts that endanger the health or well-being of an inmate. *See id.* at 687 ("There is no doubt that transfer to a more dangerous prison as a penalty for the exercise of constitutional rights has the potential to deter the inmate from the future exercise of those rights."). Here Lt. Stark is alleged to have forcibly thrown Plaintiff into the shower while Plaintiff was handcuffed, maced him, and beat him, causing serious bodily harm. Subjected to the same treatment, "a person of ordinary firmness" certainly would be deterred from exercising his right to complain of Lt. Stark's conduct again.

Finally, a dispute exists regarding causation. Causation requires "direct evidence of motivation or, the more probable scenario, ... a chronology of events from which retaliation may plausibly be inferred." *Woods*, 60 F.3d at 1166. Here, a matter of minutes passed between when Plaintiff complained to Capt. Johnson of Lt. Stark's treatment of Inmate Miller, and Lt. Stark's alleged aggression in the shower. This tight timeline coupled with Lt. Stark's alleged threat "to shut the f*** up before they

kick his a** some more" establishes a plausible basis to conclude that Plaintiff's complaint to Capt. Johnson was the but for cause of Lt. Stark's alleged aggression.

In sum, on December 21, 2017, Plaintiff also enjoyed a clearly established right to "complain[] to a supervisor about a guard's misconduct" without fear of reprisal. *Woods*, 60 F.3d at 1164. An officer confronted with the same circumstances presented here would have known that it was unlawful to physically injure—*i.e.*, "punish" —a prisoner for properly complaining of his misconduct. Yet, again, there is an evidentiary basis to conclude that this is exactly what happened. Accordingly, Lt. Stark's qualified immunity defense again fails, and Plaintiff's retaliation claim also must be submitted to the jury.

## 2.  A substantial dispute exists regarding Plaintiff's state law claims

Defendants' challenge to Plaintiff's state law negligence claim is easily dispatched. Louisiana employs the "duty-risk analysis" to determine liability for negligence under La. C.C. art. 2315. *Landers v. USIC Locating Servs., Inc.*, 2020-0890 (La. App. 1 Cir. 4/26/21), 324 So. 3d 1070, 1073.

> For liability to attach under a duty-risk analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his conduct to a specific standard of care (or the defendant owed a duty of care to the plaintiff) (the duty element); (2) the defendant failed to conform his conduct to the appropriate standard (or breached the requisite duty) (the breach element); (3) the defendant's substandard conduct was a cause-in-fact of the harm or the plaintiff's injuries (the cause-in-fact element); (4) the risk of harm was within the scope of protection afforded by the duty breached (the scope of the duty, scope of protection or legal cause element); and (5) actual damages (damages element)

*Id.*

Here, as set forth above, Lt. Stark owed Plaintiff constitutional duties to refrain from retaliation *and* malicious infliction of pain. Lt. Stark also owed Plaintiff state law duties to refrain from corporal punishment, La. R.S. § 15:829, and "to use reasonable care in preventing harm after [he] had reasonable cause to anticipate it." *Breaux v. State*, 326 So. 2d 481, 482 (La. 1976). A genuine contest exists regarding whether Lt. Stark violated these duties by throwing Plaintiff (while handcuffed) into the shower, causing Plaintiff to trip over a known hazard (the concrete partition), and then assaulted him, in order to punish Plaintiff for complaining of his prior treatment of Inmate Miller, resulting in multiple broken bones (wrist and back).

Essentially the same evidence creates a genuine dispute regarding Plaintiff's battery claim.

> The intentional tort of battery is a harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact. The defendant's intention need not be malicious nor need it be an intention to inflict actual damage. It is sufficient if the defendant intends to inflict either a harmful or offensive contact without the other's consent. In order to prove a prima facie case in an action for damages allegedly caused by the tortious conduct of the defendant, the plaintiff must prove three things: fault, causation, and damages.

*Zimmerman v. Progressive Sec. Ins. Co.*, 49,982 (La. App. 2 Cir. 8/12/15), 174 So. 3d 1230, 1235, *writ denied*, 2015-1955 (La. 11/30/15), 184 So. 3d 36.

Here, as stated, a genuine dispute exists regarding whether Lt. Stark deliberately *and* maliciously threw Plaintiff into the shower and then beat him, intending to punish him for making a complaint, resulting in immediate and

18

substantial injuries. Further, a genuine dispute exists regarding whether Plaintiff tacitly "consented" to the battery—by continuing to resist Lt. Stark even after the initial takedown—or whether Plaintiff had, by that point, already submitted to Lt. Stark's control. *See Guillot v. Guillot*, 2014-364 (La. App. 3 Cir. 12/23/14), 161 So. 3d 841, 850 (explaining that the plaintiff's consent is a defense to intentional battery).

It follows that LDPSC's sole objection to *respondeat superior* liability—that Lt. Stark "committed no tortious acts" (Doc. 41 at ¶ 7; *see* Doc. 41-1 at p. 18-21)—also fails. Plainly, the same evidence establishing a substantial dispute regarding Lt. Stark's liability for negligence and battery also establishes a substantial dispute regarding LDPSC's vicarious liability as Lt. Stark's employer. *See* La. C.C. art. 2317; *Breaux*, 326 So. 2d at 482 ("the state is ... liable for its employee's failure to use reasonable care in preventing harm after they had reasonable cause to anticipate it."); *cf. Hughes v. Savell*, 902 F.2d 376, 379 (5th Cir. 1990) ("Although the state does not insure inmates against personal attacks, the state is responsible when its employees fail to use reasonable care to protect inmates from injuries inflicted by other prisoners which the authorities know or have reason to anticipate will occur. ... Those cases which do consider the responsibility of individual state prison employees routinely impute the employee's negligence to the state for purposes of assigning liability."); *see also Payne v. Tonti Realty Corp.*, 04-752 (La. App. 5 Cir. 11/30/04), 888 So. 2d 1090, 1094 ("An employer may be vicariously liable for the intentional acts of its employees." (citing La. C.C. art. 2320), *writ denied* 2005-0192 (La. 4/1/05), 897 So.

2d 606.

III.    CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendants' **Motion For Summary Judgment (Doc. 41)** be and is hereby **DENIED**.

Baton Rouge, Louisiana, this ___17th___ day of November, 2022

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

20